**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION**

CARLO CARUANA,                                    *
                                                  *
          Plaintiff,                              *
                                                  *
     v.                                           *          CV 110-036
                                                  *
                                                  *
COLUMBIA COUNTY BOARD OF                          *
EDUCATION; COLUMBIA COUNTY                        *
SCHOOL SYSTEM; DEPARTMENT                         *
OF TRANSPORTATION;                                *
Superintendent of Schools                         *
CHARLES R. NAGLE; DEWAYNE                         *
PORTER, Director of                               *
Transportation; Assistant                         *
Superintendent ROBERT                             *
JARRELL, and CCBOE                                *
Chairman REGINA BUCCAFUSCO;                       *
CCBOE Vice-Chairman MIKE                          *
SLEEPER; CCBOE Member MILDRED                     *
BLACKBURN; CCBOE Member WAYNE                     *
BRIDGES; CCBOE Member ROXANNE                     *
WHITAKER,                                         *
                                                  *
                                                  *
          Defendants.                             *


**O R D E R**


     Presently pending before the Court is Defendants' Motion for
Summary Judgment.  (Doc. No. 32.)  For the reasons set forth below,
Defendants' motion is **GRANTED**.


**I. BACKGROUND**

     On a motion for summary judgment, the Court must view the facts
in the light most favorable to the non-moving party, Matsushita
Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986),

and must draw "all justifiable inferences in [its] favor." <u>United States v. Four Parcels of Real Prop. in Greene and Tuscaloosa Cntys.</u>, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal punctuation and citations omitted). In the present case, however, most of the operative facts are not in dispute. In fact, while Plaintiff "disputes" many of the facts set forth in Defendants' Statement of Undisputed Material Facts and Conclusions of Law, it appears that Plaintiff is not denying the actual facts but rather the implication of the facts. In other words, Plaintiff "disputes" the legal conclusions to be drawn from those facts as opposed to the accuracy of the facts as stated. Nevertheless, to the extent that there is a genuine issue of disputed *fact*, the Court has construed the facts in Plaintiff's favor.

**A. Factual Background**

This case arises from Plaintiff's May 2009 termination from his position as a bus driver for the Columbia County School District ("School District"). Plaintiff was hired by the School District in August of 2004 for an indefinite period of time. (Caruana Dep. at 30-31.) During his time as a driver, Plaintiff worked without an employment contract. (<u>Id.</u>) In 2008, Plaintiff joined the Transport Workers Union Local No. 279. (<u>Id.</u> at 26-27.) He joined the union because he felt that membership would be useful should he ever encounter employment problems. (<u>Id.</u> at 29.)

During his five years as a driver for the School District, Plaintiff was previously accused twice of having inappropriate

interactions with students. (Porter Dep. at 164-65.) In the first incident, he was accused of making inappropriate comments to female students. (Id. at 164.) Dewayne Porter, Director of the Columbia County Transportation Department, and Mr. Johnson, Principal of Evans Middle School, discussed the allegations with Plaintiff. (Id.) Plaintiff, however, denied the incident. (Caruana Dep. at 40.) Because Porter could not corroborate the allegations, he simply advised Plaintiff to avoid inappropriate conversations with students. (Porter Dep. at 164.) In the second incident, Plaintiff was accused of looking at female students inappropriately; however, he claims that these allegations were the result of his lazy eye. Once again, Porter could not corroborate the event, and Plaintiff received a written warning. (Id.)

The incident that ultimately led to Plaintiff's termination occurred in May of 2009. The details of the event are largely disputed. (Def. Stmt. of Material Fact ¶ 3.) According to Defendants, the incident was brought to the School District's attention after Leanne Fleischaur, Assistant Principal of Cedar Ridge Elementary School, received a complaint from a parent regarding Plaintiff's inappropriate interaction with his two sons. (Fleischaur Dep. at 6-8.) Mr. "S" reported that Plaintiff asked his elementary school aged son to remain on the bus after everyone exited. (Id. at 8.) According to the parent, once Plaintiff was alone with his son, Plaintiff began to rub the child's shoulders. (Id.) Mr. "S" also reported that Plaintiff gave his other son a

3

hat that displayed a Corona beer logo. (Id.) In addition, Mr. "S." stated that Plaintiff made inappropriate comments to another student, "J.C.", "about a black eye he supposedly had," and that Plaintiff mentioned "something about sucking peters." (Id. at 9.)

Fleischaur called J.C. to her office and interviewed him. (Id.) He confirmed the parent's story and informed Fleischaur that Plaintiff asked him "have you been playing with peters and sucking some weenies." (Id. at 10.) J.C. also identified other students who may have overheard Plaintiff's remarks. (Id.) Fleischaur reported the incident to Porter who conducted an investigation. (Id. at 14.) Porter requested that Fleischaur interview some of the other students on Plaintiff's bus. (Id.) Although there are some inconsistencies between the students' statements, they all referenced male genitalia when asked what, if anything, Plaintiff said to J.C. on the bus.[1]

Plaintiff claims that J.C. fabricated the incident as an act of retaliation. According to Plaintiff, he disciplined J.C. for unruly behavior, and therefore J.C. had a motive to retaliate. (Caruana Dep. at 41.) Plaintiff admits that after J.C. refused to sit quietly in his seat, Plaintiff noticed that J.C.'s eye was red and asked him "why is your eye red." (Id. at 42.) It is here where Plaintiff's version of events differs significantly from the version

---

[1] The following are the students' responses to the question of what they overheard Plaintiff say: (1) Plaintiff mentioned something about "sucking dick"; (2) Plaintiff made inappropriate remarks; (3) Plaintiff asked if J.C. "had eaten his weenies that morning?"; (4) Plaintiff asked J.C. if he had "sucked his balls?"; (5) Plaintiff asked J.C. if he had "been messing with his wiener?"; and (6) Plaintiff asked J.C. if he "had eaten his weenies this morning?"

described by the students. Plaintiff asserts that it was J.C. who made the references to male genitalia. (Id.) Plaintiff claims that after asking about J.C.'s eye, J.C. responded "well, I've heard you've been sucking people's dicks." (Id.) J.C. allegedly proceeded to swear at Plaintiff, and, in response, Plaintiff told J.C. to stay on the bus so that a teacher could handle the situation. (Id.) According to Plaintiff, J.C. responded "well, if you're going to get me in trouble, I'm going to say that you said something too." (Id. at 42-43.) To support his position that the students' fabricated their stories, Plaintiff points out that the students' statements were inconsistent and that he previously reported four of the six students interviewed to the school for disciplinary violations. (Fleischaur Dep. at 25-29.)

Porter met with Plaintiff on several occasions regarding the allegations. (Porter Dep. at 107.) Plaintiff denied making the inappropriate comments and told Porter that two students could confirm his side of the story. (Id. at 118.) However, when interviewed, these students stated that Plaintiff referenced male genitalia when conversing with J.C. (Fleischaur Dep. at 22-23.)

During their final meeting, Porter informed Plaintiff that he would recommend termination and explained the appeal options. (Id. at 50-51.) Plaintiff subsequently submitted an appeal to Deputy Superintendent Sandra Carraway ("Carraway") who met with Plaintiff.[2]

---

[2] Appeals of this nature are usually directed to Assistant Superintendent Robert Jarrell. He was unavailable to hear the appeal due to a death in his family, and thus it was assigned to Carraway.

(Carraway Aff. ¶ 4.) Plaintiff informed Carraway that he disciplined some of the students in the past, and therefore they had motive to fabricate their statements. (Caruana Dep. at 66.) After discussing the students' statements regarding the incident with Plaintiff, Carraway decided termination was appropriate. (Id. ¶¶ 5, 6.)

School Superintendent Charles Nagle ("Superintendent Nagle") reviewed the termination recommendations of both Porter and Carraway. (First Aff. of Nagle ¶ 4.) He determined that Plaintiff made inappropriate comments about male genitalia to an elementary school student. (Id.) Moreover, he was particularly concerned about the comments in light of the fact that Plaintiff was warned on two prior occasions to refrain from inappropriate interaction with students. (Id. ¶ 5.) Superintendent Nagle determined that Plaintiff's conduct constituted appropriate grounds for termination. (Id.) He informed the Columbia County School Board (the "Board") of his termination recommendation and advised Plaintiff of his right to have his termination reviewed by the Board. (Nagle Dep. at 43-44.)

Plaintiff submitted a request to the Board to have them review the termination recommendations. Plaintiff also requested that the Board conduct a hearing on his appeal. (Caruana Dep. at 68.) Superintendent Nagle presented the Board members with a compilation of documents including the correspondence confirming the termination recommendations of Porter and Carraway, witness statements, and the written materials submitted by Plaintiff regarding his case.

6

(Whitaker Aff. ¶ 7; Bridges Aff. ¶ 7; Blackburn Aff. ¶ 7; Sleeper Aff. ¶ 7; Buccafusco Aff. ¶ 7.) Superintendent Nagle did not in any way limit the materials that Plaintiff submitted to the Board. (Nagle Dep. at 50.) The Board members reviewed these materials and voted to approve the termination recommendation. (Whitaker Aff. ¶ 10; Bridges Aff. ¶ 10; Blackburn Aff. ¶ 10; Sleeper Aff. ¶ 10; Buccafusco Aff. ¶ 10.) They also voted to consider Plaintiff's appeal without granting his request for a hearing on the matter. (Id. ¶ 8.) They felt that a hearing was unnecessary because the information they received was sufficient to allow them to make a decision without holding a hearing. (Id.) The Board members terminated Plaintiff's employment because they determined that he made inappropriate comments to an elementary school student after being warned on two prior occasions to refrain from similar misconduct. (Id. ¶ 10.)

## B. Procedural History

On January 13, 2010, Plaintiff filed a complaint in the Superior Court of Columbia County alleging that Defendants violated his procedural and substantive due process rights by terminating his employment as a bus driver. (Doc. no. 1, Ex. A.) Plaintiff sought a writ of mandamus to remedy the alleged illegal conduct of Defendants. Defendants subsequently removed this action to federal court on the basis of federal question jurisdiction. (Doc. no. 1.)

After the case was removed to federal court, Plaintiff amended his complaint to add two additional federal claims. (Doc. no. 14.)

7

First, he alleged that the Board breached a 2007 Settlement Agreement by failing to provide him with an appeal hearing prior to his termination.[3]   Second, Plaintiff alleged that Defendants retaliated against union employees in violation of the First and Fourteenth Amendments.

## II. **SUMMARY JUDGMENT STANDARD**

The Court should grant summary judgment only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(c). Facts are "material" if they could affect the outcome of the suit under the governing substantive law.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).   The Court must view the facts in the light most favorable to the non-moving party, Matsushita, 475 U.S. at 587, and must draw "all justifiable inferences in [its] favor."   Four Parcels, 941 F.2d at 1437 (internal punctuation and citations omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).   How to carry this burden depends on who bears the burden of proof at trial. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways—by negating an essential

---

[3] See infra footnote 12.

element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Jones v. City of Columbus, 120 F.3d 248, 254 (11th Cir. 1997) (per curiam). A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. Clark, 929 F.2d at 608.

If—and only if—the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrate[ing] that there is indeed a material issue of fact that precludes summary judgment." Id. When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden. If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." Fitzpatrick, 2 F.3d at 1116. If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to

9

withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1116-17. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981). Rather, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

In this action, the Clerk gave Plaintiff appropriate notice of the motion for summary judgment and informed him of the summary judgment rules, the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. no. 36.) Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied. The time for filing materials in opposition has expired, and the motion is now ripe for consideration.

### III. DISCUSSION

#### A. Qualified Immunity

The individual Defendants claim that they are entitled to qualified immunity on Plaintiff's freedom of association, equal protection, and due process claims brought pursuant to 42 U.S.C. § 1983. A government official who is sued under § 1983 may seek summary judgment on the ground that he is entitled to qualified immunity. Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1263 (11th Cir. 2004). It is well established that "[q]ualified immunity

10

offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

To be eligible for qualified immunity, the official must first establish that he was performing a "discretionary function" at the time the alleged violation of federal law occurred. Crosby v. Monroe Cnty., 394 F.3d 1328, 1331 (11th Cir. 2004). Once the official has established that he was engaged in a discretionary function, the burden shifts to the plaintiff to show that the official is not entitled to qualified immunity. Holloman, 370 F.3d at 1264. The Supreme Court has set forth a two part test for the qualified immunity analysis. "The threshold inquiry a court must undertake . . . is whether [the] plaintiff's allegations, if true, establish a constitutional violation." Hope v. Pelzer, 536 U.S. 730, 736 (2002) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)). If no constitutional right would have been violated, it is unnecessary to continue the qualified immunity inquiry. Saucier, 533 U.S. at 201. However, if a constitutional right would have been violated under the plaintiff's version of the facts, the next, sequential step is to ask whether the right was clearly established. Vinyard, 311 F.3d at 1346 (internal citations and quotations omitted).

In this case, Defendants were performing a "discretionary function" of their positions when they allegedly violated Plaintiff's constitutional rights, a fact that is not disputed by either party. The burden therefore shifts to Plaintiff to show a violation of his constitutional rights. See Hope, 536 U.S. at 736. As discussed below, Plaintiff cannot establish a constitutional violation, and therefore, the individual Defendants are entitled to qualified immunity.[4]

## B. Claims Relating to Termination[5]

### 1. Violation of the Right to Free Association

Plaintiff, by way of 42 U.S.C. § 1983, alleges that Defendants violated his First Amendment right of freedom of association.[6] The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof, or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble and to petition the Government for a redress of grievances." U.S. Const. amend. I.

---

[4] The Court recognizes that it is no longer bound to follow the two-step Saucier analysis for qualified immunity, but instead has flexibility to decide which of the two prongs should be addressed first in light of the circumstances in the particular case at hand. See Pearson v. Callahan, 555 U.S. 223, 224-25 (2009). Under the facts of this case, it was more appropriate to first address the existence of a constitutional violation.

[5] Defendants dedicated a significant portion of their brief to the argument that the lack of a discriminatory animus on behalf of a "final policymaker" or "final decision maker" precludes recovery against any Defendant under § 1983. However, because Plaintiff could not establish any claim under § 1983, the Court did not consider the policymaker analysis.

[6] Although Plaintiff's Complaint alleges a First Amendment violation generally, it does not appear that Plaintiff is advancing a freedom of speech claim. Plaintiff asserts that he was terminated because of his participation in the union, not because of any particular speech associated with his union affiliation. Thus, his claim arises from an alleged violation of his freedom of association rights, not his free speech rights.

Implicit in the right to engage in these First Amendment activities is a "corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." Roberts v. United States Jaycees, 486 U.S. 609, 622 (1984). To establish a claim under § 1983 for violating First Amendment rights, a plaintiff must show (1) a violation of a constitutional right, and (2) that the alleged violation was committed by a person acting under color of state law. Holmes v. Crosby, 418 F.3d 1256, 1258 (11th Cir. 2005); Griffin v. City of Opa-Locka, 261 F.3d 1295, 1303 (11th Cir. 2001).

Public employees, including Plaintiff, are protected by the right to free association, and the First Amendment prohibits retaliation based on the expression of that right. Garcetti v. Ceballos, 547 U.S. 410, 417 (2006) ("The Court has made clear that public employees do not surrender all of their First Amendment rights by reason of their employment."); Smith v. Arkansas State Highway Emps., Local 1315, 441 U.S. 463, 465 (1979) ("The public employee surely can associate and speak freely and petition openly, and he is protected by the First Amendment from retaliation for doing so." (citing Pickering v. Bd. of Educ., 391 U.S. 563, 574-75 (1968))). The right to freely associate, however, is not unqualified. See Garcetti, 547 U.S. at 418 ("When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom.").

The framework for striking the appropriate balance between a public employee's First Amendment rights and the government's interest in efficiency was established in Pickering v. Board of Education, 391 U.S. 563 (1968). First, a plaintiff must prove that he was engaging in associative activity not in the course of his employment, but rather as a "citizen." D'Angelo v. Sch. Bd. of Polk Cnty., 497 F.3d 1203, 1212 (11th Cir. 2007). Here, Plaintiff's union membership amounts to associative activity as a citizen. See Douglas v. Dekalb Cnty., No. 1:06-cv-484, 2007 WL 4373970, at *3 (citing Fuerst v. Clarke, 454 F.3d 770, 774 (7th Cir. 2006)). Once a plaintiff has met his burden on this threshold legal issue, a court must determine (1) whether an adverse action occurred, and (2) whether the constitutionally protected association was a substantial or motivating factor in the employment decision. Starling v. Bd. of Cnty. Comm'rs, 602 F.3d 1257, 1261 n. 1 (11th Cir. 2010); Hatcher v. Bd. of Pub. Educ., 809 F.2d 1546, 1558 (11th Cir. 1987). If the employee can meet this burden, the burden shifts to the employer to show that it would have made the same decision, even in the absence of the protected conduct. Douglas, 2007 WL 4373970, at *3.

Based on the evidence presented, there is no need to balance the Pickering factors because Plaintiff's union activity did not form the basis of the termination decision. See Douglas v. Dekalb Cnty., 308 Fed. Appx. 396, 399 n. 1 (11th Cir. 2009) ("Since we are persuaded the adverse employment actions were not motivated by protected union activity, we need not perform a Pickering

14

balancing."); Shahar v. Bowers, 114 F.3d 1097, 1113 (11th Cir. 1997)

("Pickering balancing does not apply where the employee's

constitutionally protected conduct did not motivate the employer's

decision. In such a case, balancing is not necessary; the employer

prevails because the employee has not established the element of

causation.") (Tjoflat, J. specially concurring). Although Plaintiff

was a union member, the record contains overwhelming evidence that

he was terminated for making inappropriate references to male

genitalia and would have been terminated even in the absence of

protected union activity. Both Porter and Carraway independently

investigated the allegations against Plaintiff. They found that the

majority of students interviewed confirmed that Plaintiff referenced

male genitalia. (Porter Dep. at 117; Carraway Aff. ¶ 9.) This

misconduct was compounded by two prior incidents where Plaintiff was

accused of inappropriate interactions with students and warned to

refrain from such interactions in the future. (Id.)

Plaintiff points to the inconsistencies in the students'

statements as evidence that he was terminated for his union

participation. However, the inconsistencies are insufficient to

demonstrate that Plaintiff was terminated in retaliation for union

activity. In fact, Porter considered these inconsistencies when

reaching his decision to terminate Plaintiff's employment. (Porter

Dep. at 518.) Porter acknowledged the variations in the statements,

but found that each student referenced male genitalia which, to

Porter, supported the fact that Plaintiff made inappropriate comments about the male anatomy. (Id.)

Carraway, like Porter, considered these variations in reaching her decision to uphold Porter's termination recommendation. She found that, despite some inconsistencies, all the interviewed students used words referring to male genitalia when describing Plaintiff's comments. (Pl.'s Ex. 14 ¶ 6.) Moreover, Carraway believed that the inconsistencies were not unusual given the timing between the incident and the interviews.[7] (Id.) She explained that had Plaintiff followed protocol and submitted a referral form detailing the event, the accounts of the incident might have been more accurate because the students would have been interviewed sooner. (Id.) Thus, there is nothing to suggest that the inconsistencies in the students' stories support Plaintiff's claim that he was terminated for his union activity. Defendants need only advance one reason as to why they were justified in terminating Plaintiff, and here they have established that they believed that he made inappropriate comments and they terminated him as a result. Mt. Healthy v. Doyle, 429 U.S. 274, 286 (1977); Bush v. Houston Cnty. Com'n, 414 Fed. Appx. 264, 267 (11th Cir. 2011) (the ultimate issue is whether the decisionmaker believed that the employee violated the rule, not whether the employee actually violated the rule).

---

[7] The students were interviewed several days after the incident occurred.

Even if this Court were to balance the Pickering factors, Plaintiff is unable to demonstrate that his union affiliation played a substantial part in the termination decision because he did not present any evidence suggesting that Defendants were aware of his union activities. In order for Plaintiff to carry his burden on this issue, he must produce "more than a mere scintilla of evidence that [his union affiliation] played a substantial part in the decision not to keep him on as an [employee]." Bartes v. School Bd. of Alachua Cnty., No. 04-15459, 2005 WL 2764744, at *4 (11th Cir. 2005). Here Plaintiff has not met his burden. Plaintiff asserts that Porter was aware of his union membership at the time he made the termination recommendation. However, when asked whether Porter knew of his union affiliation, Plaintiff responded "I would have no idea." (Caruana Dep. at 74.) Moreover, nothing in Porter's deposition supports Plaintiff's assertion. Porter explained that he does not oppose anyone's right to join a union and did not consider whether Plaintiff was affiliated with the union when formulating his termination recommendation. (Porter Dep. at 428, 434.)

Furthermore, Superintendent Nagle explained that he did not consider whether Plaintiff was a member of the union. (Nagle Dep. at 50.) Additionally, the five Board members all stated that they based their termination decisions on the evidence presented to them and not on Plaintiff's union affiliation. (Whitaker Aff. ¶¶ 7, 9 ; Bridges Aff. ¶¶ 7, 9 ; Blackburn Aff. ¶¶ 7, 9; Sleeper Aff. ¶¶ 7, 9; Buccafusco Aff. ¶¶ 7, 9.) According to the Board members,

17

Plaintiff's conduct constituted appropriate grounds for termination. (Id. ¶ 10.) Plaintiff has offered no evidence, other than conjecture, to rebut this testimony.

Based upon the foregoing, the evidence establishes that Plaintiff was terminated because he made inappropriate comments to a student and not because he belonged to the union. Although Plaintiff vehemently denies making these statements, the evidence establishes as a matter of law that Plaintiff was not terminated for union activity. There is simply no evidence that Defendants were aware of Plaintiff's affiliation with the union. Even if Defendants were aware, there is nothing in the record to suggest that Plaintiff's union activity played a substantial part in the termination decision. Thus, Defendants' motion for summary judgment on Plaintiff's freedom of association claim is **GRANTED**.[8]

---

[8] Plaintiff also argues that a "cat's paw theory" of liability should apply because the School Board approved Porter's termination recommendation without conducting an independent investigation. The cat's paw theory allows a plaintiff to establish causation by showing that the decision maker followed a biased recommendation without independently investigating the complaint against the employee. Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1332 (11th Cir. 1999). In such a case, the recommender is using the decision maker as a mere conduit, or "cat's paw," to give effect to the recommender's discriminatory animus. Llampallas v. Mini-Circuits, Lab, Inc., 163 F.3d 1236, 1249 (11th Cir. 1998). Despite Plaintiff's claim to the contrary, the cat's paw theory is not applicable to the facts of the present case. As noted above, Plaintiff has failed to demonstrate that Porter knew of his union affiliation at the time he recommended termination, and thus cannot establish that Porter harbored a discriminatory animus.

To the extent that Porter may have based his termination decision on Plaintiff's union affiliation, there is no evidence that Carraway, Superintendent Nagle, and the Board members acted as "mere conduits" for Porter's discriminatory animus. Although these individuals considered Porter's recommendation, they made their employment decisions based on the totality of the circumstances, including an independent review of the record. (Whitaker Aff. ¶ 7; Bridges Aff. ¶ 7; Blackburn Aff. ¶ 7; Sleeper Aff. ¶ 7; Buccafusco Aff. ¶ 7.) Thus, there is no evidence that the Board members effectuated Porter's recommendation without conducting an independent review.

## 2. Violation of Equal Protection Rights[9]

Plaintiff asserts that his termination amounted to a violation of his equal protection rights. Specifically, Plaintiff claims that the Board upheld the termination recommendation because of his classification as a union member. The Equal Protection Clause prohibits a state from denying to "any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XVI, § 1. The Clause embodies the principle that all similarly situated people should be treated alike. City of Cleburn v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). To establish his claim, Plaintiff must show that (1) he was treated differently from others who were similarly situated on the basis of his union activities, and (2) Defendants had no rational basis for the alleged dissimilar treatment. Smith v. Atlanta Indep. Sch. Dist., 633 F. Supp. 2d 1364, 1381 (N.D. Ga. 2009) (citing Cleburn, 473 U.S. at 439-42). "Different treatment of dissimilarly situated persons does

---

[9] Plaintiff did not specifically plead an Equal Protection violation in his amended complaint. Instead, the amended complaint raises a breach of contract claim, a due process claim, and a First Amendment claim. Under established Eleventh Circuit precedent, the non-moving party may not assert new claims at the summary judgment stage. Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1314 (11th Cir. 2004). "At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a). A plaintiff may not amend his complaint through argument in a brief opposing summary judgment." Id. at 1315.

The Court, however, addresses the Equal Protection claim because of its close connection with Plaintiff's Freedom of Association claim. In his amended complaint, Plaintiff alleges that Defendants took "retaliatory actions against" members of the union. (Doc. no. 14 at ¶ 9.) As evidence of retaliation, Plaintiff alleges that union employees were subject to "selective enforcement of work rules, selective implementation of disciplinary actions, undue scrutiny . . ., and selective granting of employment benefits." (Id. at ¶ 10.) These allegations suggest the basis of Plaintiff's differential treatment of union members as compared to non-union members. Thus, the Court considered both an Equal Protection claim and a First Amendment claim.

not violate the equal protection clause," and courts are obligated to apply the similarly situated requirements with rigor. Griffin Indus., Inc. v. Irvin, 496 F.3d 1189, 1207 (11th Cir. 2007) (citing E&T Realty v. Strickland, 830 F.2d 1107, 1009 (11th Cir. 1987) (internal quotations omitted)).

The Eleventh Circuit has held that when an employee alleges discriminatory discipline, to determine whether employees are similarly situated, "it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999) (internal citations omitted).[10]  "The most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed." Id. The quantity and quality of the comparator's misconduct must be nearly identical to prevent courts from second-guessing employers' reasonable decisions.  Id.

Plaintiff identifies several non-union employees who he believes engaged in conduct that was similar to his, but who received less severe punishments.  He points to four specific individuals: Mr. Turman, Ms. Modest, Ms. Jewell, and Ms. Reeves. Mr. Turman was a non-union bus driver accused by several students of

---

[10]  The Court is cognizant of the fact that the plaintiff in Maniccia claimed that her termination violated Title VII and that she did not assert an Equal Protection claim pursuant to § 1983.  Despite the difference in the claim asserted, the similarly situated standard of Maniccia is applicable in the Equal Protection context.  Other courts have applied a similar analysis when determining whether employees were similarly situated for Equal Protection purposes.  See Catlett v. Peters, No. 98-CV-3273, 1999 WL 1269196, at *7-8 (N.D. Ill. Dec. 23, 1999); Grady v. City of Orlando, No. 96-CV-1295, 1998 WL 657663, at *3-4 (M.D. Fla. June 25, 1998).

20

pushing another student. According to Mr. Turman, a high school student was cursing and becoming increasingly disruptive. (Porter Dep. at 377.) The student refused to let Mr. Turman pass him, and as a result, Mr. Turman physically moved the student to the side so that he could move past. (Id. at 378.) Porter investigated the incident, but found that the witnesses' accounts of the situation were unreliable. (Id.) After interviewing the students, Porter questioned whether they actually saw anything since they were in the bottom of the stairwell, and there was a barrier between their line of sight and the event they described. (Id.) Porter advised Mr. Turman that touching students in any way can be misinterpreted and result in disciplinary action, but ultimately decided not to recommend discipline at that time. (Id. at 333.)

Ms. Modest was a non-union bus driver accused of embarrassing a special needs student. She admitted to making the alleged embarrassing statement and was counseled by the school principal. (Id. at 326-28.) Porter warned Ms. Modest that her comments were inappropriate. (Id. at 327.) After she was warned, the school received another call claiming that Ms. Modest once again embarrassed the student, this time chastising him over the intercom for telling his mother about her prior comments. (Id. at 329.) In a letter, Porter advised Ms. Modest that she was not to make any more inappropriate comments to students. (Id.) He reminded her that she must maintain a professional attitude on the bus and warned

that if the problem continued, he would recommend disciplinary action. (Id.)

Ms. Jewell was a non-union bus driver accused of improper supervision after allegations arose that two students engaged in inappropriate touching during her route. (Id. at 500.) As a consequence of the incident, Porter advised Ms. Jewell that while running a route with empty seats, male and female students should not sit together. (Id.) Porter also warned her to be more vigilant in her duty to constantly supervise the students in her care. (Id.)

Ms. Reeves was a non-union bus monitor accused of discussing prison sexual abuse with students. According to Porter, a group of female students were discussing a television show about prisons. (Id. at 502.) During a discussion regarding the sexual activities of inmates, Ms. Reeves made a comment that she was formerly employed as a correctional officer and that the students did not want to go to a correctional facility. (Id. at 503.) She was not disciplined for her comments, but was advised to avoid conversations of a sexual nature with students.

Although the comparators identified by Plaintiff arguably engaged in inappropriate conduct, the misconduct engaged in by these individuals is easily distinguished from Plaintiff's misconduct in both quantity and quality. None of the four individuals cited by Plaintiff had prior incidents of misconduct that resulted in warnings from their superiors. Plaintiff, on the other hand, was accused of talking about a woman in an inappropriate manner, asking

students inappropriate personal questions, looking at female students inappropriately, and giving a child a hat containing a Corona beer logo.

With regard to the allegations against Mr. Turman, Porter was unable to verify the allegations and doubted the veracity of the students' statements. Porter did not harbor these same concerns in Plaintiff's case because the majority of the students' statements made some reference to male genitalia. With regard to the specific misconduct of Ms. Jewell and Ms. Reeves, their misconduct simply does not rise to the same level as Plaintiff's misconduct. Ms. Jewell did not make any inappropriate comments to students. Her misconduct arose solely from improperly supervising the students on her bus. Ms. Reeves did not initiate the conversation regarding prison sexual abuse, and her comments did not reference male genitalia. Moreover, Ms. Reeves' comments were made to older students, whereas Plaintiff directed his comments towards elementary school students. Finally, Ms. Reeves merely interjected her opinion into an ongoing conversation. She did not begin the sexual discussion and did not make the comments to embarrass a particular student. Thus, the four individuals identified by Plaintiff cannot be considered similarly situated.

In support of his claim that he was treated differently than non-union employees, Plaintiff contends that Porter, when dealing with these four non-union employees, accepted the possibility that the students' statements were false. Plaintiff argues that in his

23

case, Porter never considered that the students fabricated their stories. Plaintiff, however, fails to recognize that on several prior occasions Porter took Plaintiff's word over the students' statements. For example, Porter could not corroborate allegations that Plaintiff made inappropriate comments to female students, and thus did not pursue disciplinary action. (Porter Dep. at 164). Moreover, after conducting an investigation into allegations that Plaintiff inappropriately rubbed a student's shoulders, Porter determined that Plaintiff should not face disciplinary action because of the lack of witnesses and Plaintiff's denial. (Id. at 125).

Thus, Plaintiff's claim that Porter treated non-union employees differently during the investigation phase of their cases is without merit. The evidence demonstrates that in all situations where Porter could not verify the students' allegations, including incidents involving Plaintiff, the employees were not subject to disciplinary action. Thus, there is nothing to suggest that Porter treated Plaintiff and non-union employees differently in terms of discipline.

Here Plaintiff has not presented a valid comparator as a matter of law. He failed to identify any similarly situated non-union employees who engaged in misconduct nearly identical to his, but who received less severe disciplinary sanctions. Accordingly, as Plaintiff has failed to present proper comparators, he cannot establish that his equal protection rights were violated, and

24

Defendants' motion for summary judgment on the equal protection claim is **GRANTED**. See Harlen Assocs. v. Inc. Vill. Of Mineola, 273 F.3d 494, 499 n. 2 (2d Cir. 2001) ("[A] court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met.").

### C. Claims Relating to Termination Procedures

#### 1. Violation of Settlement Agreement[11]

Plaintiff asserts that the Board's failure to grant his request for an appeal hearing amounted to a violation of the 2007 Settlement Agreement ("Settlement Agreement"). The Settlement Agreement at issue was the result of a prior lawsuit between members of Plaintiff's union and the School District.[12] Plaintiff's claim that the Board violated the Settlement Agreement appears to be twofold. First, the Settlement Agreement stated that School Board counsel would provide an "expanded grievance policy." Plaintiff, however, argues that the Board restricted the grievance procedures instead of expanding them. Second, Plaintiff contends that the Board's failure to provide him a direct appeal and a hearing amounted to a violation of the Settlement Agreement.

---

[11] Plaintiff's breach of contract claim is pursued only against the Board, and not against any individual Defendant. (Joint Stipulations ¶ 7.)

[12] In the prior suit, members of the Transport Workers Union of America, AFL-CIO, and Transport Workers Union Local Union No. 279 filed suit against the Columbia County School District and the members of the Columbia County Board of Education in the United States District Court for the Southern District of Georgia, Augusta Division. The plaintiffs alleged that they were denied the opportunity to speak about certain matters and that they were discriminated against based on their union affiliation. In an effort to mutually resolve the issues without a Court proceeding, the parties agreed to the terms of the Settlement Agreement.

In order to understand Plaintiff's contentions, it is necessary to distinguish between the two types of School District employees: certified personnel and classified at-will personnel. (Nagle Dep. at 28-29.) Certified employees include teachers, administrators, and certified educators. (Id. at 28.) They hold advanced degrees in education or possess other state certifications. (Id.) Classified at-will employees are non-certified staff including custodians, bus drivers, secretaries, paraprofessionals, and nutrition employees. (Id.) Pursuant to O.C.G.A. § 20-2-211, all certified professional personnel must be issued an annual contract. Classified at-will employees, on the other hand, are not entitled to a contract of employment and are at-will employees. Plaintiff was a classified at-will employee as evidenced by the fact that he was hired for an indefinite period of time and worked without a contract of employment. (Caruana Dep. at 30-31.)

The School District maintains separate and distinct policies and procedures for certified and classified at-will employees. The policy and procedures applicable to Complaints and Grievances of *certified employees* are coded "GAE." The policy and procedures applicable to the suspension and termination of *classified at-will personnel* are coded "GCK." For ease of reference, the Court will refer to the two categories of employees henceforth as either certified or classified at-will employees, Plaintiff falling into the latter category.

## a.   **Policy GAE Does not Apply to Plaintiff**

Under the terms of the Settlement Agreement, the Board stated that it would expand the grievance procedures for classified at-will employees.   The pertinent provision of the Settlement Agreement is as follows:

> In the best interest of all parties and all employees, School Board Counsel will draft an expanded grievance policy (GAE-1)[13] for all classified employees, including employees of the Transportation Department.   Pursuant to this expanded policy, classified employees with at least 24 months of continuous service with the Board of Education can appeal to the Board of Education or its Personnel Committee any recommendation to terminate such employee(s) before final action to terminate is taken by the Board.   The Administration will continue implementing procedures on due process.   The Administration will prepare procedures to define process.

(Doc. no. 39 at 9.)

Prior to the Settlement Agreement, Policy GAE (applicable to certified employees) provided that "when hearing an appeal from a prior level, the local Board of Education shall hear and decide all appeals de novo."   (Hobbs Aff., Ex. A.)   In promising to expand the grievance policy for classified at-will employees, the Board revised Policy GCK (applicable to classified at-will employees) to provide: "Upon good cause the Board may grant such employees the opportunity of an appeal hearing."   (Pl.'s Ex. 44.)   Plaintiff's first claim with respect to the Settlement Agreement is that the Board did not provide an "expanded grievance policy."   Instead, Plaintiff contends

---

[13] The policy that applies to classified at-will employees is actually policy "GCK."   The policy was erroneously identified as "GAE1" in the Settlement Agreement.   "GAE1" applies to certified employees, and "GCK" applies to at-will, "classified" employees.   (Nagel Aff. ¶ 14.)

that the implementation of the revised Policy GCK restricted the rights available under Policy GAE because classified at-will employees are no longer entitled to an automatic appeal hearing. Stated differently, Plaintiff contends that the revised version of Policy GCK restricts the appeal rights available under Policy GAE such that the Board failed to provide for an "expanded grievance policy" as set forth in the Settlement Agreement.

At the outset, the Court recognizes that Plaintiff's contention presupposes that he was subject to Policy GAE. He was not. In reviewing Policy GAE, the Court notes that it clearly applies only to certified personnel. Not only does Policy GAE reference "certified" employees, but the purpose of the policy is to implement the provisions of O.C.G.A. § 20-2-989.5. (Hobbs Aff., Ex. A.) Subpart (b) of O.C.G.A. § 20-2-989.5 states that it is the duty of local school administrations to "adopt a complaints policy for *certified personnel*." (emphasis added). Second, "termination, non-renewal, demotion, suspension, or reprimand of an employee" are specifically excluded from Policy GAE. Board policies and procedures relating to termination or suspension of *certified* employees carry the descriptive code "GBN." Thus, Policy GAE does not apply to Plaintiff who is a *classified at-will employee* seeking a review of a *termination decision*.

The only policy that is relevant to Plaintiff is Policy GCK, which explicitly references classified at-will employees seeking reviews of termination decisions. Therefore, to the extent that

Plaintiff's argument challenges Policy GCK because it restricted Policy GAE in violation of the Settlement Agreement, that argument must fail because Policy GAE and the rights attendant to it are wholly irrelevant to Plaintiff's case.

### b. Policy GCK Expanded the Grievance Procedure As Required by the Settlement Agreement

The Court must next consider whether Policy GCK expanded the grievance procedures available to classified at-will employees in accordance with the Settlement Agreement. Based upon a comparison between the version of Policy GCK in place before the Settlement Agreement and the version revised after the Settlement Agreement, it appears that the Board provided an "expanded grievance policy." Pursuant to the Settlement Agreement, certain classified at-will employees could appeal a termination recommendation before final action was taken. Further, the Columbia County School Administration agreed to implement procedures on due process. The Board complied with both provisions of the Settlement Agreement.

First, under the revised version of Policy GCK, classified at-will employees who maintain continuous employment for a minimum of twenty-four (24) months are afforded the right to have their termination recommendations reviewed. Unlike the version of Policy GCK in place before the Settlement Agreement, the revised version of Policy GCK provides an employee the opportunity to apply for an appeal hearing. Second, the School District implemented new procedures relating to due process, which is called "Procedure GCK." Procedure GCK describes in detail the process an employee must

follow in order to have a termination recommendation reviewed by the Board. Procedure GCK also describes the appeal hearing process should the Board decide to grant a hearing. Therefore, the Board complied with the Settlement Agreement because it expanded the grievance policy for classified at-will employees and implemented Procedure GCK.

### c. The Board Complied with the Provisions of Policy GCK and Procedure GCK

Plaintiff next contends that the Board breached the Settlement Agreement by denying him the opportunity to appeal directly to the Board. In order to resolve this issue, the Court must determine whether the Board complied with the provisions of Policy GCK and Procedure GCK. Pursuant to Policy GCK and Procedure GCK, after a review by the Assistant Superintendent and Superintendent Nagle, the employee has the right to have the termination recommendation reviewed by the Board. (Pl.'s Exs. 44, 45.)

Here, Plaintiff sought review of his termination decision. Indeed, Plaintiff admits that he "appealed to the Board because that was the process." (Caruana Dep. at 68.) He wrote a statement to the Board explaining the incident on his bus and provided his side of the story. (Id. at 69.) This statement was submitted to the Board along with other written materials related to the termination recommendation. (Whitaker Aff. ¶ 6; Bridges Aff. ¶ 6; Blackburn Aff. ¶ 6; Sleeper Aff. ¶ 6; Buccafusco Aff. ¶ 6.) The Board reviewed those materials and decided to uphold the termination

recommendation. (Id. ¶ 10.) Therefore, Plaintiff was provided the opportunity to have his case reviewed by the Board.

In regard to the argument that Plaintiff was entitled to a hearing before the Board under the terms of the Settlement Agreement, this claim must also fail. The Board complied with Policy GCK and Procedure GCK when it determined that an appeal hearing was unnecessary. Nothing in Policy GCK or Procedure GCK provides for an unqualified right to a hearing. While Policy GCK and Procedure GCK allow classified at-will employees a right to appeal a termination recommendation, the Board reserves the right to determine whether to conduct hearings on those appeals. (Whitaker Aff. ¶ 16; Bridges Aff. ¶ 16; Blackburn Aff. ¶ 16; Sleeper Aff. ¶ 16; Buccafusco Aff. ¶ 16.) Policy GCK states that "*upon good cause*, the Board *may* grant such employees the opportunity of an appeal hearing." (Doc. no. 64, Ex. 14) (emphasis added).

Moreover, counsel for the School District who negotiated the Settlement Agreement confirmed that, during the negotiations between the parties, the union demanded that certain classified at-will employees be granted the right to a hearing before the Board in connection with all termination recommendations by the School Superintendent. (Fletcher Aff. ¶ 4.) The Board, however, rejected this request. (Id. ¶ 5.)

Therefore, under the terms of the final Settlement Agreement, the Board reserved the right to determine, on a case- by-case basis, whether to conduct evidentiary hearings on termination

31

recommendations for classified at-will employees. (Id. ¶ 6.)
Plaintiff applied for a hearing, and the Board considered his
request. (Whitaker Aff. ¶ 5; Bridges Aff. ¶ 5; Blackburn Aff. ¶ 5;
Sleeper Aff. ¶ 5; Buccafusco Aff. ¶ 5.) The Board, however, voted
to deny Plaintiff's request because they determined that the grounds
for the termination recommendation were sufficiently presented to
them in written materials, and thus there was no need for a hearing.
(Id. at ¶ 8.) Because Plaintiff was not entitled to an automatic
appeal hearing, the Board did not violate the Settlement Agreement
in failing to grant his request. Thus Defendants' motion for
summary judgment on Plaintiff's breach of contract claim is **GRANTED**.

### 2. 42 U.S.C. § 1983 Denial of Procedural Due Process

Plaintiff next claims that his termination amounted to a
violation of procedural due process, and he seeks relief pursuant to
§ 1983. In order to establish a procedural due process violation
under § 1983, a plaintiff must show: "(1) a deprivation of a
constitutionally-protected liberty or property interest; (2) state
action; and (3) constitutionally-inadequate process." Grayden v.
Rhodes, 345 F.3d 1225, 1232 (11th Cir. 2003). Even if Plaintiff
alleges and satisfies these elements, he cannot state a federal
procedural due process claim if adequate state remedies are
available to him. McKinney v. Pate, 20 F.3d 1550, 1562-64 (11th
Cir. 1994).

The Fourteenth Amendment protects against the government's
deprivation of liberty or property without procedural due process.

Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 569 (1972).

State law determines whether a public employee has a property

interest in his or her job.  Bishop v. Wood, 426 U.S. 341, 344

(1976); Barnett v. Housing Auth. of Atlanta, 707 F.2d 1571, 1576

(11th Cir. 1983) (overruled on other grounds).  A constitutionally

protected property interest is created if there are "rules of

mutually explicit understandings that support [a] claim of

entitlement."  Perry v. Sindermann, 408 U.S, 593, 601 (1972).  "To

obtain a protected property interest in employment, a person must

have more than a mere unilateral expectation of continued

employment; one must have a legitimate claim of entitlement to

continued employment."  Warren v. Crawford, 927 F.3d 559, 562 (11th

Cir. 1991).  Thus, to evaluate the validity of Plaintiff's

procedural due process claim, the Court must first determine whether

he had a protected property interest in his employment as a bus

driver with the School District.

Under Georgia law, in the absence of a controlling contract

between the parties, employment for an indefinite period of time is

terminable at will by either party.  Land v. Delta Air Lines, 130

Ga. App. 231 (1973); see also O.C.G.A. § 34-7-1.  Moreover, a public

employee generally has no property right in such employment.

Ogletree v. Chester, 682 F.2d 1366, 1369 (11th Cir. 1982) (citing

Barnes v. Mendonsa, 110 Ga. App. 464 (1964)).  However, a public

employee has a property interest in his job if his employment allows

dismissal only for cause.  Warren, 927 F.3d at 562.  An explicit

33

contractual provision, rules, or common understanding may determine whether an employee is terminable at will or only for cause. DeClue v. City of Clayton, 246 Ga. App. 487, 489 (2000). The expectations of the parties involved are also relevant to this issue. Maxwell v. Mayor & Aldermen of Savannah, 226 Ga. App. 705, 707 (1997).

Plaintiff contends that Policy GCK provided him with a protected property interest. Policy GCK states that the Superintendent can terminate, pending Board approval, "any auxiliary employee who fails to comply with employment expectations and rules, who fails to perform assigned duties, *or for any other good and sufficient cause.*" (Pl.'s Ex. 44) (emphasis added). Plaintiff asserts that, based on this language, he could only be terminated for cause, and thus he had an expectation of continued employment sufficient to bestow a protectable property interest.

Policy GCK further provides "nothing in this policy shall grant the right to continued employment or change the legal status of at-will employees." (Id.) Procedure GCK contains a similar disclaimer and states that the procedure is merely designed "to give auxiliary employees a fair means to have terminations . . . informally reviewed." (Pl.'s Ex. 45.) Defendants contend that this disclaimer demonstrates that Plaintiff remained an at-will employee and that the School District did not intend to expand the rights of classified at-will employees.

Despite Plaintiff's claim to the contrary, Policy GCK does not grant him a property interest in continued employment because the

34

Superintendent has broad discretion to recommend termination. Although Policy GCK contains "for cause" language, it does not provide that Plaintiff could *only* be terminated for cause. Cf. Glenn v. Newman, 614 F.2d 467, 472 (5th Cir. 1980) (provision that allowed suspension only "for cause" created a property interest).[14] Policy GCK states that the Superintendent may terminate, pending Board approval, "any employee who fails to comply with employment expectations and rules, who fails to perform assigned duties, or for any other good and sufficient cause." (Pl.'s Ex. 44.) The Columbia County Auxiliary Employment Handbook provides a list of ten (10) specific expectations for School District employees. (Pl.'s Ex. 43.) However, the Handbook also states that the guidelines are offered to insure that employees understand expectations for job performance and that they are "not intended to be all-inclusive" because "other specific expectations exist for all positions." (Id.) The fact that the Superintendent could terminate an employee for violating an employment expectation not expressly listed in the Handbook or in Policy GCK demonstrates that he could terminate for reasons other than "good cause." See Warren, 927 F.2d at 563 (finding no property interest because employees could be dismissed at the discretion of the administrator); Georgia Ports Auth. v. Rogers, 173 Ga. App. 538, 539 (1985) (finding no property interest when policy manual's list of reasons for termination indicated that

---

[14] See Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1207 (11th Cir. 1981) (holding Fifth Circuit decisions made on or before September 30, 1981, are binding precedent in Eleventh Circuit).

it was not exclusive of other possible reasons). Thus, despite the "for cause" language, Policy GCK places no limit on the Superintendent's ability to determine whether an employee complied with employment expectations and recommend termination based on that decision. See Edwards v. Brown, 699 F.2d 1073, 1076-77 (11th Cir. 1983) (finding no property interest because ordinance placed no limit on the commissioner's discretion to determine whether an employee had fulfilled the standards of "good behavior and efficient service").

Moreover, even if the "for cause" language limited the Superintendent's ability to recommend termination, that limitation applies only to the Superintendent and not to the Board. Both Eleventh Circuit and Georgia case law recognize that, under certain circumstances, policies and personnel manuals which include language that an employee may only be terminated "for cause" grant the employee a property interest in continued employment. See Brown v. Ga. Dep't of Revenue, 881 F.2d 1018, 1024-25 (11th Cir. 1989) (finding state granted a property interest by providing that permanent status employees may not be fired except in accordance with the Personnel Board rules); Barnett, 707 F.2d at 1576-77 (noting the personnel policy permitted involuntary discharge only "for cause," which limited the power of the appointing body to dismiss and created a property interest in continued employment); Brownlee v. Williams, 233 Ga. 548, 550-51 (1975)(finding statute that stated that the appointing authority could only dismiss for

36

cause created a property interest in continued employment); DeClue, 246 Ga. App. at 489-90 (holding policy that allowed disciplinary action against employees only for certain specified reasons was evidence that the employee had a property interest in continued employment).

However, Policy GCK is distinguishable from the policies in the above-cited cases. In those cases, the employees had property interests because the "for cause" language curtailed the *employer's* right to terminate in a substantial way. See Brown, 881 F.2d at 1027 (the "for cause" language suggested that there was some substantive limitation on the state's ability to terminate covered employees); Barnett, 707 F.2d 1576-77 ("We conclude that, by limiting the power of the appointing body to dismiss an employee, these regulations confer on [the plaintiff] a valid property interest in continued employment"); see also Dethrow v. Parkland Health Hosp. Sys., No. 3:00-cv-2126, 2002 WL 413905, at *5 (N.D. Tex. March 11, 2002) (finding that in order for an employment policy to alter the at-will nature of employment, "the policy must specifically and expressly limit the *employer's* ability to terminate the employee" (emphasis added)). Under the facts of this case, the Board has the authority to terminate, not the Superintendent. Pursuant to Policy GCK, the Superintendent can *only* recommend termination; the recommendation, however, is subject to Board approval. Moreover, Superintendent Nagle stated that he does not have unilateral authority to terminate any employee, and that this

37

authority rests solely with the Board. (Nagle Dep. at 44.) Thus, unlike the above-cited cases, nothing in Policy GCK limits the Board's (the employer) right to terminate. Because the "for cause" language does not apply to the Board, it does not create a protectable property interest.

Interpreting the "for cause" language as applying only to the Superintendent's termination authority is consistent with the disclaimer that the policy was not meant to transform the status of at-will employees. The disclaimer affirms the Board's intent that Policy GCK does not alter its legal relationship with classified at-will employees. Therefore, despite the apparent contradiction between the "good cause" language and the disclaimer, the two are reconcilable. The "good cause" language applies only to the Superintendent, while the disclaimer demonstrates that the "good cause" language was not meant to affect the relationship between the Board (the employer) and classified at-will employees. Therefore, Defendants' motion for summary judgment on Plaintiff's procedural due process claim is **GRANTED**.

3. <u>42 U.S.C. § 1983 Denial of Substantive Due Process</u>

Plaintiff also asserts that Defendants terminated his employment in violation of his substantive due process rights. However, the protection of substantive due process does not apply in the employment law context. Instead, the substantive due process protections of the United States Constitution extend only to certain fundamental rights so "implicit in the concept of ordered liberty"

that "no amount of process can justify [their] infringement." Gibson v. City of Gadsden, 377 Fed. Appx. 953, 956 (11th Cir. 2010) (quoting McKinney, 20 F.3d at 1556-57); White v. Hall, 389 Fed. Appx. 956, 959 (11th Cir. 2010). "Because employment rights are state-created rights and are not 'fundamental' rights created by the Constitution, they do not enjoy substantive due process protection." Gibson, 377 Fed. Appx. at 956. Thus, Defendants' motion for summary judgment on Plaintiff's substantive due process claim is **GRANTED**.[15]

## IV. CONCLUSION

Upon the foregoing, Defendants' Motion for Summary Judgment (Doc. no. 32) is **GRANTED**. The Clerk is directed to **ENTER JUDGMENT** in favor of Defendants and **CLOSE** this case.

**ORDER ENTERED** at Augusta, Georgia this _29th_ day of March, 2012.

_____
HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA

---

[15] It appears from the parties' briefs that Plaintiff also claims that the denial of a hearing amounted to a violation of his Equal Protection rights. Because Plaintiff failed to present any evidence of similarly situated non-union employees who received a hearing, Plaintiff's claim must necessarily fail.

39